[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband commenced this action for a dissolution of marriage on the ground of irretrievable breakdown by application for a prejudgment remedy seeking to garnish a number of bank accounts. In his accompanying complaint, he sought an assignment of the defendant wife's interest in jointly owned real estate, an equitable division of the other jointly owned property and other relief as on file. The wife's answer admitted all of the allegations of the complaint. In her cross complaint she sought a legal separation on the grounds of irretrievable breakdown. She also sought alimony, an assignment of the plaintiff's interest in the jointly owned family dwelling, an equitable distribution of the marital assets and other relief, as on file.
The parties were represented by counsel throughout these vigorously contested trial proceedings. There were also a number of pendente lite hearings. Each party submitted financial affidavits and written proposed orders. Each testified (the wife through a Greek interpreter) and called several witnesses, including both adult daughters who testified on behalf of the wife. A large number of documents were introduced into evidence. Counsel made oral argument, and at the conclusion of the hearing, were granted permission to file posttrial stipulations as to health insurance, the defendant's claim for a legal separation, and the status of a certain bank deposit in Greece. They were also granted permission to file authorities on the treatment of the plaintiff's workers' compensation award in an action for marital dissolution.
From the evidence, I find as follows.
The couple married July 16, 1972, in New London, Connecticut. The wife's birth name was Belekl. The husband has resided continuously in this state for at least one year immediately before the filing of the complaint. The parties have two children, issue of the marriage, who have reached their majority. No other minor children were born to the wife since the date of the marriage. All statutory stays have expired; neither party has been a recipient of public assistance. The court has jurisdiction. CT Page 1643
The husband is 64 years of age, and has suffered from three heart attacks and associated hospitalizations. He takes medication daily. He received a second grade education in Greece. He was born here and is a U.S. citizen, went to Greece as a young child, and returned to this country at age 17. He speaks and understands English, but does not read or write it well. He worked as a dishwasher for a brief period. He then obtained a job with Pfizer Chemical Co. for whom he worked continuously until 1988, when he was compelled to leave on a disability. He began his 37 years work career at the company by doing cleaning and maintenance; he left his employment as a welder and pipefitter, a skilled occupation.
He receives $235[1] per week gross in social security benefits and $57 per week in disability income. His total gross and net weekly income, including dividends, is $306 per week, as reported on his financial affidavit. The $57 per week disability payments will end when he goes into retirement pay status on his fully vested Pfizer pension; this would provide him with sums ranging from $1,022 to $1,381 per month for life, depending on which plan option was selected. Considering his age and health, he has virtually no employability and minimum earning capacity.
The wife is 54 years of age, suffers from high blood pressure and claims her "nerves are shot." She takes medication for her condition.
She received an elementary school education in Greece and speaks and understands some English. She testified through an interpreter, who also sat with her at the counsel table. Despite over 23 years in this country, she never obtained formal schooling in English, nor did she become a citizen. She did not work in the labor market outside of the home and has minimal employability and earning capacity. She has homemaking skills.
The husband was 40, the wife 30, when they married. Their marriage was `arranged' by their families. There was a dowry, which involved land in Greece. The husband provided her passage to the United States. Aside from the dowry, the wife had no funds. After the marriage, the parties resided in the present family dwelling, which was then jointly owned by the husband and his mother. The husband spent two years renovating the property. The mother eventually deeded her interest in the house to the couple and was compelled to leave the house, mainly because of the wife. CT Page 1644
Each spouse blamed the other for the destruction of their marriage. The husband claimed that the wife acted bizarrely and irrationally, verbally assaulted him in a profane manner and was obsessed with money and buying things. She was apprehended a number of times on shoplifting charges which he claims resulted in his embarrassment, humiliation and confusion.
The wife asserts that the marriage was good for the first 18 years and that the husband changed in 1990. She claims he physically and verbally assaulted her and threatened to leave her without a cent, which would force her to go on welfare. She also claimed that the husband cut her off from some of her friends, and kept her isolated as if she were in a prison. She casts some of the blame for the damage to the marriage on one of the husband's friends, who visited almost daily for a time. She never learned to drive and lacks sophistication, and the husband's threats to her about going on welfare, although not likely to come to fruition, were to her, real. The husband attempted to dominate and control her.
There are kernels of truth in each spouse's testimony; however, I have doubts about the credibility of both spouses, considering their demeanor, attitude and conduct, and have greater doubts about the husband's testimony. What is abundantly clear from the evidence is that the parties cannot communicate with each other civilly and that they argue heatedly. They attempted a reconciliation and sought some counseling, mostly at the instigation of the husband, which was unsuccessful.
They have been separated for over a year, and the marriage has completely broken down. They each must shoulder a share of the blame for that breakdown, but in the view I take of the case, and considering the credibility of the parties and the witnesses under the totality of the circumstances, I must allocate a somewhat greater portion of that responsibility to the husband.
The wife was the principal homemaker and care giver to the children. She cooked, cleaned and did the laundry, and the husband turned over the management of the family finances to her.
The couple amassed substantial assets during the marriage. This included the jointly owned, two family home, 494 Vauxhall Street, New London, Connecticut, which I find has a value of CT Page 1645 $76,000. The house is mortgage free, and one dwelling unit is occupied by the wife. The other, by the couple's elder daughter and her boyfriend who pay no rent. The fair market rental value is about $500 per month, which should be available to the wife.
The parties' financial affidavits disclose the following assets in addition to the house.
Husband's: real estate in Greece, some held jointly with the wife, some inherited from his parents, with no value reported; household furnishings of $1,000; a credit union account of $2,750; funds on deposit in Greece of $966; Pfizer stock of $20,896; and jointly owned Pfizer stock of $2,579; and, an interest in previously jointly held bank deposits of $193,522 from which the wife had removed his name. These funds were in the wife's name alone or with the children and are now in escrow. He has a retirement plan, in which he is fully vested, and which has a present value of $168,000; and a 1988 Ford car which I find has a value of $2,500.
Against these assets, his only reported liability is for attorney's fees.
The wife's financial affidavit reports the house to be worth $56,000; furnishings worth $4,500; the husband's property in Greece at an unknown value; the garnished or escrowed funds with balances of $193,522; other bank accounts of $18,573;[2] and her inheritance (including, presumably, land and bank deposits) in Greece of $20,000.
Against these assets, she reports $16,094 in liabilities, which include $9,500 in attorney's fees and a $2,500 hospital liability, for which she has not been billed.
Neither party discloses the total interest income available from the funds in escrow; the wife reports $104[3] per week received by her from said funds, which was court ordered, but does not disclose how much she receives from her other bank deposits. Nor did she disclose the true value of her bank account in Greece,[4] or the income thereon, which appears to be substantial. This understatement and omission make her financial affidavit inaccurate and cast doubt on her testimony.
The husband received a worker's compensation net settlement of $136,212 in late 1992, and net proceeds of $143,446.42[5]
CT Page 1646 after taxes in 1993, from his employment related deferred compensation savings and investment plan. Some of the funds were "rolled over" into an IRA account. The balance so rolled over was withdrawn in 1994. In violation of a court order, he also cashed in an IRA account of about $23,000 which he used to pay income taxes. The balance of these monies remaining after withholdings for taxes, approximately $280,000, he claims he gambled away at the casino within a year and a half. He further claims that none of these funds remain.
The plaintiff converted some of the funds into cash. There was no credible evidence which tended to corroborate the level and extent of his gambling or the amounts he claims he lost.[6]
He testified that he hid the cash in a tubeless spare tire in his car. One of the financial affidavits he filed falsely stated he had none of these funds, although shortly afterward, he produced $5,000 in cash which he deposited in a bank account. The false financial affidavit and his repeated violations of court orders cast grave doubt on his testimony. I disbelieve his testimony as to the rapid dissipation of this large amount of money and do not credit it. Taking into account the liquidation into cash of these funds conducted by the plaintiff, and the lack of any corroborating evidence as to his gambling habit and losses, and the plaintiff's own statements, I conclude that the plaintiff embarked upon systematic campaign to attempt to insulate these funds from the claims of his wife.
Even if it is true, as the plaintiff testified, that he squandered in excess of $280,000 on gambling, the court concludes that the value of these funds must be properly included in the marital assets or estate available for distribution, and the wife awarded a monetary amount either in the form of alimony, a lump sum, or, by assignment of other property, which represents her equitable share of the marital assets. The court perceives no significant difference between this case where the plaintiff has removed or dissipated assets from the marital estate and placed them out of reach, and a case of a fraudulent conveyance which could not be set aside as to the grantees. See Watson v. Watson, 221 Conn. 698 (1992);Miller v. Miller, 22 Conn. App. 310 (1990). "Such an outcome prevents a party to a dissolution from inequitably benefitting [benefiting] from his fraudulent transfer of real property by reducing the assets that would otherwise be included in the marital estate and available for assignment pursuant to General Statutes § 46b-81." Watson, supra, 709. CT Page 1647
The plaintiff, implicitly in his proposed orders, and candidly in oral argument, recognizes this concept, by asking by way of relief, that he be "allowed the proceeds from his Pfizer savings investment plan and workers' compensation settlement."
The plaintiff's additional argument that his workers' compensation specific award for his permanent loss of function should not be included in the estate available for distribution has no merit. See cases such as Tyc v. Tyc, Superior Court, Judicial District of Hartford-New Britain at Hartford, No. 513300 (October 1, 1992, 7 Conn. L. Rptr. 416). (TYC I) and (TYC II), reported at 12 Conn. L. Rptr. 7, 215 (1994).
The worker's compensation award clearly constitutes a presently existing property interest subject to assignment by the court pursuant to General Statutes § 46b-81. Although General Statutes § 31-320 states, in pertinent part that, "All sums due for compensation under the provisions of this Chapter shall be exempt from attachment and execution and shall be nonassignable before and after award,: this does not have the effect of insulating such funds from support obligations to the worker's spouse. See Rodriguez v. Rodriguez, Superior Court, Judicial District of Hartford, at Hartford, Docket No. 539452 (14 Conn. L. Rptr. No. 7, 215, 1995, Sullivan, J.); (TYC II).
The following additional findings are made. A portion of the plaintiff's retirement and savings investment plans accumulated prior to the marriage, although there was no evidence as to the values of the plans as of the date of the marriage. As the wife never earned outside income during the marriage, it is clear that the husband's monetary contributions to the acquisition, preservation or appreciation of value of the marital assets, including the marital dwelling, greatly exceeded those of the wife's always was the sole breadwinner in the family. However, it should be pointed out, and I so find, that the wife's thrift and husbandry also contributed to the accumulation and preservation of the garnished/escrowed funds, which are still on hand.
The wife's nonmonetary contributions to the marriage were greater than the husband's. The parties lived a very modest life style, although they enjoyed several trips to Greece. They never maintained or used a checking or charge accounts, or credit CT Page 1648 cards.
Evidence was also introduced that each party was in possession of gold coins, bonds, etc. Neither reported these items on their financial affidavits, nor, were values of these items disclosed thereon. The wife holds a safety deposit box; the husband took a strong box from the home in violation of a court order. Inventories of the contents of these boxes where the items were allegedly stored were not provided. Accordingly, as to these items, the court declines to enter any orders, and leaves the parties as they are.
As a result of the orders set forth below, the wife has ample liquid funds with which to pay the fees of her attorney and interpreter. I cannot find, from the totality of circumstances, and after considering all of the factors in General Statutes § 46b-62, that a denial of such fees would impair or otherwise undermine said financial orders.
The defendant has not briefed her claim for a legal separation. However, in a posttrial stipulation, the parties have provided information as to the cost of continued health insurance for employees, retired employees under and over age 65 and spouses. At this time, while the plaintiff remains a disabled employee not in retiree status, and under age 65, the cost of health insurance coverage appears to be borne entirely by his employer. The cost of COBRA coverage, however, for the defendant wife would be significant; moreover, it would terminate at the end of the statutory period. Given her present age, this would leave a substantial gap in her coverage until she was eligible for medicare.
Considering the totality of circumstances, including the rising costs and decreasing availability of health insurance coverage to our citizens, it would be appropriate, at this time, in light of the wife's age and problematic employability, to enter a decree of legal separation.
I have considered all of the factors in General Statutes §§ 46b-62, 46b-81 and 46b-82 in the determination of the financial awards hereinafter set forth, in the light of the evidence and findings. I have also considered the taxable consequences and implications of such awards.
Accordingly, a decree of legal separation may enter on CT Page 1649 the ground of irretrievable breakdown. The following orders shall also enter.
(1) All right, title and interest in the following property, real and personal, is hereby assigned to and vested in the wife: the family dwelling at 494 Vauxhall Street, New London, Connecticut, and the furniture and furnishings therein; the property derived from her family in Greece; her bank account in Greece; all of the bank deposit certificates of deposit and bank accounts shown on her financial affidavit, excepting for $42,000 thereof (and the credit union account in paragraph (2) below), which are assigned to the husband.
(2) All right, title and interest in the following property, real and personal, is hereby assigned to and vested in the husband: the sum of $42,000 from the accounts referred to in paragraph (1) above; the 1988 Ford motor vehicle; the personal property now in his possession; the real property in Greece derived from his family; the $650 money order; the Pfizer stock and stock options; his credit union account of $2,750 shown on his financial affidavit; and his bank account in Greece of $966.
(3) There is vested and assigned to the wife 50 percent of the husband's retirement plan benefit, by Qualified Domestic Relations Order (QDRO). The husband shall retain the other 50 percent. He shall select the joint survivor annuity beneficiary option 1; and, a preretirement survivor beneficiary option; each spouse shall be the survivor beneficiary of the other's portion. The court shall retain jurisdiction over the QDRO until accomplished and accepted by the plan administrator thereof.
(4) The husband shall irrevocably designate the wife as beneficiary of the Pfizer life insurance policy in the face amount of $62,000 shown on his financial affidavit. He shall execute and deliver to her an authorization directed to the life insurance carrier to enable her to directly determine the status and good standing of said policy.
(5) Each shall pay his or her own attorney's fees.
(6) The defendant shall pay the liabilities shown on her financial affidavit and her interpreter's fee.
(7) The parties shall cooperate in arranging for the continuation of the wife as a covered dependent on the husband's CT Page 1650 employment and/or retirement related health insurance coverage, at his sole cost until his retirement. Thereafter, the husband shall pay one half of the wife's premium therefor for a period of three years after the date of his retirement.
(8) Until the wife is eligible to receive benefits from the retirement plan, he shall pay to the wife the sum of $100 per week as periodic alimony; thereafter, $35 per week. The alimony shall terminate upon the death of either party, the wife's remarriage or pursuant to the provisions of General Statutes § 46b-86 (b), or her age 62, at which time she shall be eligible for social security benefits.
(9) All documents incidental or necessary to effect these orders shall be completed and exchanged within thirty (30) days herein.
Teller, J.